*Attorney Grievance Commission of Maryland v. Jonathan Christian Dailey*, Misc. Docket AG No. 1, September Term 2019. Opinion by Raker, J. (Senior Judge, Specially Assigned)

**ATTORNEY MISCONDUCT – DISCIPLINE – DISBARMENT –** Respondent Jonathan Christian Dailey violated the Maryland Lawyers' Rules of Professional Conduct 1.6(a) and 8.4(a), (c), and (d) and the Maryland Attorneys' Rules of Professional Conduct 19-308.4(a), (c), and (d) when he solicited, received, and mismanaged financial transactions from a client shortly after the client received her settlement. Respondent took advantage of his client's lack of legal sophistication and trust in him as an attorney to induce her into giving him money as "investments," misappropriated it, and provided her repeatedly with misleading and false information about it. Disbarment is the appropriate sanction for respondent's misconduct.

Circuit Court for Montgomery County
Case No. 464961
Argued: December 9, 2019

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 1

September Term, 2019

_____

ATTORNEY GRIEVANCE COMMISION OF MARYLAND

v.

JONATHAN CHRISTIAN DAILEY

_____

Barbera, C.J.
McDonald,
Watts,
Hotten,
Getty,
Booth,
Raker, Irma S.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Raker, J.

_____

Filed: March 18, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Attorney Grievance Commission, acting through Bar Counsel, filed in this Court a Petition for Disciplinary Action against Jonathan Christian Dailey, respondent, alleging violations of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") and the Maryland Attorneys' Rules of Professional Conduct ("MARPC").[1] The Commission charged respondent with violating MLRPC 1.6(a) (Confidentiality of Information), 1.15(a) and (d) (Safekeeping of Property),[2] 5.4(a) (Professional Independence of a Lawyer), and 8.4(a), (c), and (d) (Misconduct). The Commission also charged respondent with violating MARPC 19-308.1(a) (Bar Admission and Disciplinary Matters) and 19-308.4(a)–(d) (Misconduct). Pursuant to Maryland Rule 19-727, we referred the matter to Judge Margaret M. Schweitzer in the Circuit Court for Montgomery County to make findings of fact and proposed conclusions of law. Judge Schweitzer held an evidentiary hearing and concluded that respondent violated MLRPC 1.6(a) and 8.4(a), (c), and (d) for his conduct occurring before July 1, 2016 and MARPC 19-308.4(a), (c), and (d) for his conduct occurring after July 1, 2016.[3]

---

[1] The Commission charged respondent under both MLRPC, which were in effect prior to July 1, 2016, and MARPC, which became effective July 1, 2016, because respondent's acts of misconduct occurred before and after July 1, 2016. Effective July 1, 2016, MLRPC were renamed MARPC. Rules Order (June 6, 2016).

[2] The Commission withdrew its MLRPC 1.15(a) charge following the hearing. The MLRPC 1.15(d) charge remained, but Judge Schweitzer did not discuss or state her conclusion of law on this charge. The Commission did not except to Judge Schweitzer's lack of legal conclusion on this charge.

[3] Judge Schweitzer's summary of her conclusions of law referenced "MARPC 19-308.4(a)–(d)." It appears, however, that she did not mean to include MARPC 19-308.4(b), which applies to "a *criminal act* that reflects adversely on the (footnote continued . . .)

I.

Before the commencement of the July 30, 2019 hearing, Judge Schweitzer heard Respondent's Motion to Dismiss Petition for Discipline or Remedial Action as a Matter of Law and denied it pursuant to Md. Rule 19-725(c).[4] At the end of the hearing, the Commission withdrew the MLRPC 1.15(a) charge,[5] and Judge Schweitzer made the following findings of fact and conclusions of law:

---

attorney's honesty, trustworthiness or fitness as an attorney in other respects" (emphasis added). The Commission's only ground for charging respondent with MARPC 19-308.4(b) was for testifying falsely under oath and thus committing an act of perjury on June 20, 2018, and Judge Schweitzer found that respondent did *not* testify falsely under oath. Furthermore, in Petitioner's Recommendation for Sanction, the Commission excluded MARPC 19-308.4(b) when summarizing Judge Schweitzer's conclusions of law.

[4] Md. Rule 19-725(c) provides that in proceedings on a petition for disciplinary or remedial action, "[m]otions to dismiss the proceeding are not permitted."

[5] MLRPC 1.15(a) provides as follows:

> "(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created."

## FINDINGS OF FACT

"The Respondent, Jonathan Christian Dailey, was admitted to the Maryland Bar on December 12, 1995.

\*\*\*

### Representation of Sherry Gaither

"Since 2009, the Respondent has operated the Law Office of Jonathan C. Dailey, a sole proprietorship.[] The Respondent's practice is focused primarily on representing plaintiffs in medical malpractice and personal injury matters. . . .

"Sherry Renee Gaither has spent most of her career working in the security services industry. Ms. Gaither has also, at times, been employed as a driver for Uber Technologies, Inc. The highest level of education completed by Ms. Gaither is 12th grade.

"On April 11, 2011, Ms. Gaither retained the Respondent to represent her in an employment discrimination case in the United States District Court in the District of Maryland, *Sherry Gaither v. Paragon Systems, Inc*, Case No. 8:12-CV-00086-RWT. Around May 5, 2012, the parties reached a settlement for $17,000 with Paragon Systems, and

Ms. Gaither received $10,108.70 as her portion of the settlement funds.

**The Respondent Solicits Ms. Gaither to 'Invest' her**

**Settlement Proceeds**

"As of May 2012, the Respondent was representing . . . Terry Hedgepeth[] in a medical malpractice lawsuit filed in the Superior Court of the District of Columbia in 2005. (*Terry Hedgepeth v. WWC, et al.*). The Respondent was representing Mr. Hedgepeth on a contingency fee basis and, as such would get a percentage of the proceeds.

"In May 2012, within days after Ms. Gaither received her settlement funds from the Respondent, the Respondent approached Ms. Gaither with what he described to her as an opportunity to invest in his upcoming case. The Respondent advised Ms. Gaither that if she invested funds with his law firm, those funds would be used to finance the litigation of one of his firm's pending case[s]. The Respondent told Ms. Gaither that whatever amount she invested would be 'guaranteed' and that he could possibly 'double [her] money[.]' The Respondent described the transaction to Ms. Gaither as 'a real money-maker[.]'

4

"On May 15, 2012, only ten days after the *Paragon* settlement, the Respondent sent Ms. Gaither an email attaching a document entitled 'Letter Agreement.' The Letter Agreement required Ms. Gaither to pay an 'Investment Amount' of $27,000 to the Respondent and stated that the funds would be used by the Respondent 'for the purpose of advancing the litigation against Whitman Walker Clinic ("WWC") in the case of *Terry Hedgepeth v. WWC, et al*.' The Letter Agreement also included a section titled 'Obligation of Entrepreneur' which stated:

> 'In consideration of the investment in the [*Hedgepeth*] Case, Entrepreneur shall pay to Investor the full return sum of $27,000, by or before the end of the fiscal year 2012, if the Case settles or resolves by trial by jury for less than $500,000. The return sum of $27,000 is guaranteed and is not conditioned upon the outcome of the Case. In the event that the Case settles or resolves by trial by jury for more than $500,000, Investor shall be paid a return of 100% of the investment, or a total amount of $54,000, by or before the end of fiscal year 2012. Entrepreneur shall advise the Investor of the status of the Case every month and will make payment as set forth herein within 20 days of receipt of payment resulting from a settlement or verdict of the Case. It is the intention of the Entrepreneur to double the investment of the Investor, but only the principal investment of $27,000 is guaranteed.'

5

"The Court does not find that the agreement dated May 15, 2012 was intended to be an agreement to share attorney's fees with Ms. Gaither, a non-attorney. First, it should be noted that in the agreement, the $27,000 was to be repaid regardless of whether there were any fees collected by the Respondent. Despite the language in the agreement, the Court concludes based upon the actions and words of the Respondent that he never intended to share fees. Unfortunately, for the Respondent, the Court is also of the opinion that the Respondent was not intending to abide by the agreement and its assurances, and that the guarantees were empty promises by him. The Court finds that the agreement was not an agreement to share fees but rather a vehicle containing alluring provisions to entice Ms. Gaither into turning over funds to the Respondent. This is supported by the fact that the *Hedgepeth* case settled in August 2012, just a few months after the agreement, for $400,000, of which Respondent received personally $140,000. When the Respondent received his fees, the Respondent did not: 1) return in full the guaranteed $27,000 by or before the end of the fiscal year 2012; 2) advise Ms. Gaither of the state of the case every month, as Ms. Gaither

testified she got no information other than it was a financial loss to his firm; or 3) make payment within twenty days of the receipt of payment resulting from the settlement or verdict of the case.

"In his May 15, 2012 email to Ms. Gaither, the Respondent stated the following, '[Mr. Hedgepeth] will not accept a settlement less than $1 Million[.]'. Respondent later testified that he meant to say that his own goal was to settle for that price, rather than stating Mr. Hedgepeth's expectations. Respondent's proposition contradicts the plain language of his statements to Ms. Gaither. The Court finds that the Respondent intended to express Mr. Hedgepeth's expectations for the case, and that Respondent made the statement to Ms. Gaither to induce her to 'invest' her funds.

"In the May 15, 2012 email, the Respondent also made the following knowing and intentional misrepresentation to Ms. Gaither:

> 'Please keep this Agreement, our emails and conversations <u>confidential</u> as instructed by [Mr. Hedgepeth]. He has authorized me to reveal details of his case to you for the purposes of this investment in his case.'

7

"The Petitioner contends, and the Court finds, that the Respondent failed to obtain Mr. Hedgepeth's informed consent before disclosing confidential information to Ms. Gaither, specifically the amount Mr. Hedgepeth was willing to accept in settlement. The Court notes that the Respondent offered testimony regarding his communications with Mr. Hedgepeth that conflict with his representations to Ms. Gaither. During a statement under oath given on June 20, 2018, the Respondent testified that he never explicitly explained to Mr. Hedgepeth that he had entered into any loan arrangement with Ms. Gaither. At the hearing, when asked whether he had received authorization from Mr. Hedgepeth to share confidential information with Ms. Gaither, the Respondent testified, 'I assured [Mr. Hedgepeth] that I was not going to share attorney-client privileged information with her. I simply said it was a loan against attorney's fees that would have no effect on his case[.]' Based on the Respondent's testimony during the statement under oath and the hearing, the Court finds that the Respondent failed to obtain Mr. Hedgepeth's informed consent before disclosing the amount Mr. Hedgepeth was willing to accept in settlement to Ms. Gaither.

8

"In a separate email to Ms. Gaither, also sent on May 15, 2012, the Respondent instructed Ms. Gaither to wire the funds to his firm's operating account maintained at the Community Banks of Colorado.[6]   Pursuant to the Respondent's instruction, on May 16, 2012, Ms. Gaither wired $5,000 to the Respondent's operating account, and on May 22, 2012, she wired an additional $22,000 to the account.

### The Respondent Uses Ms. Gaither's Funds for his Personal Benefit

"In the May 15, 2012 email, the Respondent made the following statement to Ms. Gaither:

> 'I have to prepare now for trial and your investment will go toward that preparation.  I am sending funds to our infectious disease specialist and our psychiatrist as soon as investment funds are received.'

"The Court finds this statement, too, to be a knowing and intentional misrepresentation Respondent made to Ms. Gaither.  The Court received as evidence the Respondent's operating account records from NBH Bank[7] for the period

---

[6] The Respondent has never been admitted to the Colorado Bar nor has he ever practiced law in Colorado.

[7] Community Banks of Colorado is a subsidiary of NBH Bank.

May 2012 through January 2016. A review of the records demonstrates that, prior to Ms. Gaither's May 16, 2012 wire transfer, the Respondent's operating account had a balance of $55.41. During the period of May 15 through June 18, 2012, the only deposits made into the account were Ms. Gaither's two wire transfers totaling $27,000. The records demonstrate, and Respondent confirms, that between May 15 and June 18, 2012, the Respondent disbursed $26,200 of Ms. Gaither's funds from his operating account to pay for a variety of personal expenses unrelated to the *Hedgepeth* case. Examples of his personal expenditures include: Revel Casino, Apparel Lacy Couture, Classic Beer and Wine and Netflix.com. The only transaction related to the *Hedgepeth* case was a check dated June 11, 2012, in the amount of $800 made payable to Dr. Donald Vogel, an expert witness. By June 18, 2012, the Respondent had disbursed the entirety of Ms. Gaither's funds and his operating account had a negative balance of -$1,056.20.

"The Court finds that the Respondent knowingly and intentionally misrepresented to Ms. Gaither that her 'investment' would be used to fund the litigation of the *Hedgepeth* case. The fact that the Respondent spent almost the

entirety of Ms. Gaither's funds on personal expenses in approximately four weeks makes it clear that the Respondent never had any intention of using Ms. Gaither's funds to pay for litigation costs in the *Hedgepeth* case. The Respondent's 'investment opportunity' was a deception created by the Respondent for the purpose of obtaining funds from Ms. Gaither under false pretenses and then using those funds as an interest free personal loan. During her testimony, Ms. Gaither made it clear that she would never have given the Respondent any funds if she had known they would be used for his own personal expenses.

### The Hedgepeth Settlement

"In August 2012, the *Hedgepeth* case settled for $400,000. The settlement funds were deposited in the Respondent's firm's attorney trust account.[8] The Respondent testified at the hearing that his firm received approximately $160,000 in attorney's fees as a part of the settlement, and that his firm retained $140,000 and paid another firm approximately $20,000 in fees. The Respondent failed to

---

[8] The Respondent could not provide the specific date the funds were deposited in the account.

inform Ms. Gaither within 20 days, as per the agreement, that the *Hedgepeth* case had settled, the amount of the settlement, or the fact that his firm collected a large sum in attorney's fees. The Respondent failed to deliver any portion of the *Hedgepeth* settlement funds to Ms. Gaither and instead, intentionally misrepresented to her that the case 'didn't do well' and was a 'huge loss.' When questioned at the hearing why Ms. Gaither wasn't considered as one of the firm's creditors and considered as part of costs, Respondent replied, 'In retrospect, I should have made a better decision.'

### The Cover-Up

"In September 2012, the Respondent sent an email to Ms. Gaither stating the following:

'Sherry,

If you are interested, I am offering the same deal on my 'severed pinky' case that I offered on my HIV misdiagnosis case. You are currently owed $20,000[9] by the end of the year (or sooner).

I would offer a '100%' return on an investment of the $20,000—or $40,000, with a guarantee of a return of the initial $20,000 when the case

---

[9] Throughout the correspondence between Ms. Gaither and the Respondent they both state that the investment amount is $20,000; however, the Respondent's operating account records clearly show that Ms. Gaither gave the Respondent $27,000. Neither Ms. Gaither nor the Respondent could provide an explanation for this discrepancy.

settles.  We filed suit and the case is no [*sic*] on-going.  We expect a trial date next year.

Because it is a permanent injury and our client is 50, we expect a jury award between $400,000–$1M.  I would offer the deal of a double return if the case settles/resolves by trial jury verdict of $350,000 or higher.

Let me know!'

"Ms. Gaither expressed interest in participating in the 'investment.'  In December 2012, the Respondent sent Ms. Gaither another email and stated:

'Sherry—I have two major HIV misdiagnosis cases that I recently signed based upon the publicity I gained in the last case.  I am going to include these cases to your 'pinky case' to ensure that no matter what case settles, you will see the return from one of them (hence, giving you further assurance of your return, spread out to three cases, not just the pinky case, to secure your investment).

I have appreciated the faith you have placed in me and want to make sure you feel confident and comfortable with the fact that you will see a return.'

"The Respondent told Ms. Gaither that her funds would be 'transferred' to the three new cases.  On January 1, 2013, the Respondent and Ms. Gaither entered into a second agreement.  The terms of the January 1, 2013 Letter Agreement were identical to the May 15, 2012 Letter Agreement except

13

that Ms. Gaither's funds were to be used to advance the litigation of *Robert Dyer v. REL, Case No. 2012-CA-007315*, in the Superior Court of the District of Columbia,[10] as well as two medical malpractice cases for Bobby Russell and Robert Blount that had yet to be filed. The Respondent was representing the clients in all three of these cases on a contingency fee basis. The Respondent told Ms. Gaither that her funds would be used, '[f]or the case, for the witnesses, for the filing, for the different litigations, whatever was necessary as far as to build the case.' Like the first agreement, the January 1, 2013 agreement included a section titled 'Obligation of Entrepreneur' which states:

> 'In consideration of the investment in the [*Dyer*] Case, Entrepreneur shall pay to Investor the full return sum of $20,000 if the Case settles or resolves by trial by jury for less than $250,000. The return sum of $20,000 is <u>guaranteed</u> and is not conditioned upon the outcome of the Case. In the event that the Case settles or resolves by trial by jury for more than $400,000, Investor shall be paid a return of 100% of the investment, or a total amount of $40,000. Entrepreneur shall advise the Investor of the status of the Case (to include the two HIV cases) every month and will make payment as set forth herein within 20 days of receipt of payment resulting from a settlement

---

[10] In their correspondence, the Respondent and Ms. Gaither refer to the *Dyer* case as the 'pinky' case.

14

or verdict of the Case. It is the intention of the Entrepreneur to double the investment of the Investor, but only the principal investment of $20,000 is guaranteed.'

"The Court finds that, for the same reasons discussed in regard to the May 15, 2012 Letter Agreement, the Respondent's January 1, 2013 Letter Agreement was not an agreement to share attorney's fees with Ms. Gaither, a non-attorney.

"For the period 2013 through 2017, the Respondent knowingly and intentionally misrepresented to Ms. Gaither that her funds were being used to finance the litigation of the three cases. When Ms. Gaither requested status updates on the cases, the Respondent would tell her they were either still in litigation or that they settled but 'didn't do well.' The Court finds that the Respondent made the misrepresentations to avoid repaying Ms. Gaither, and to deceive her into believing that he was still in possession of her funds and that he was using them for the purpose stated in their agreement.

### Ms. Gaither Requests Refunds

"Beginning in or about 2013, Ms. Gaither began to experience significant financial difficulties. On April 27, 2015, Ms. Gaither, believing the Respondent was still in

possession of her funds, sent an email to the Respondent in which she urgently requested that the Respondent return $5,000 of her funds explaining that she was experiencing financial hardship. At trial, Ms. Gaither testified that she was unemployed, was getting assistance from her brother, and was going through financial difficulties. She stated that she had 'claimed' bankruptcy and was going through depression. On the next day, April 28, 201[5], Ms. Gaither sent another email in which she requested that the Respondent return the entirety of her funds as soon as possible. On May 12, 2015, the Respondent provided Ms. Gaither with $5,000.

"On August 14, 2015, in response to Ms. Gaither's request for a status update for the *Dyer* case, the Respondent wrote:

'Sherry,

I need to assign other cases to your return as the 'pinky' case had to be settled for peanuts because my client could not pay trial costs. The $5,000 sent earlier is a third of our attorney's fee of $15,000 in that case—disappointing.

BUT—I am going to assign the cases of *Sean Taylor* (assault and battery against a well-known restaurant/bar), *Matthew Sateri* (breach of contract against Enterprise for not paying life insurance when he was killed in a car accident with his rental) and *Maurice Parker*

16

(discrimination case pending in DC federal court right now). These cases WILL settle.

As promised, I will get you the total principal back and a profit, through one case or another—I won't let you down, Sherry.'

"The Court does not find . . . these statements to be admissions of sharing attorney's fees, but rather statements by the Respondent to assure Ms. Gaither that the Respondent was above board, dealing fairly with her regarding her investment.[11]

"On March 3, 2016, at the request of Ms. Gaither, the Respondent provided her with an additional $5,000. On September 3 and 12, 2016, Ms. Gaither sent the Respondent emails requesting that he return $10,000 to her by the end of the month. The Respondent replied to Ms. Gaither's emails and stated, 'I will work on getting something to you, but this is a particularly tight time for my law practice.' Notably, in the Respondent's testimony at the hearing, the Respondent acknowledged that nowhere in his agreements with Ms. Gaither did he condition returning her funds on the financial

---

[11] The fee sharing was pursuant to the second Letter Agreement but did not comport with the terms of the Agreement. According to the Agreement, Ms. Gaither should have received the entirety of the *Dyer* attorney's fees, purportedly $15,000.

17

circumstances of his law firm. As previously noted, the Respondent admitted, however, that he viewed Ms. Gaither as a creditor that should have been considered as a part of the Respondent's costs. As of the date of the hearing in this disciplinary matter, the Respondent has failed to return any additional funds to Ms. Gaither.

\*\*\*

## Bar Counsel's Investigation

"On November 15, 2017, Ms. Gaither filed a complaint with Bar Counsel. During Bar Counsel's investigation, the Respondent gave a statement under oath on June 20, 2018.

\*\*\*

"The Court finds that the Respondent did not knowingly and intentionally testify falsely in this deposition with Bar Counsel on June 20, 2018. The Court finds that the May 15, 2012 Letter Agreement, expressly stating that in the event that the *Hedgepeth* case settles or resolves by trial for more than $500,000, the Respondent would repay Ms. Gaither $54,000, was not an agreement to share fees, but rather part of a concerted effort on the part of the Respondent to encourage Ms. Gaither to give Respondent her money. The Court does

18

not find, given the history of events in this case, that Respondent if he received a $500,000 settlement instead of the $400,000 that he did receive[] that the Respondent would have doubled Ms. Gaither's money and returned to her $54,000. The Court is confident in this prediction since after receiving [the] $400,000 settlement, he failed to pay any of the 'guaranteed' $27,000.

"The Court finds that the agreement is not what the Respondent purported it to be, a 'guaranteed investment,' but rather a personal 'loan' to the Respondent with ever-changing repayment and return provisions determined solely by the Respondent. The Court makes the same assessment of the August 14, 2015 email. The Court finds that the delivery of the $5,000 to Ms. Gaither, was not part of a fee but rather a token payment to support the illusion that he was abiding by the agreement and was a fair dealing partner in this venture.

\*\*\*

The Court views the emails and agreements as continuing empty promises solely intent on getting and retaining Ms. Gaither's investment. Therefore, the Court does not find that

19

he made knowingly and intentional misrepresentations in his statement under oath regarding monies paid to Ms. Gaither.

"Finally, Petitioner alleges that, during the Respondent's deposition, in response to a question regarding the Respondent's use of Ms. Gaither's funds, the Respondent knowingly and intentionally testified falsely . . . . The full reading of the transcript shows that when questioned about the expenditure after the deposit of Ms. Gaither's monies, the Respondent admitted that while some expenditures were personal in nature, and some were possibly business but could be personal, **only** one check for $800, for an expert witness, was an expenditure to benefit a specific case. The statement by Respondent was, at best, an attempt to explain what he used the monies for, and the Court does not find it was a false statement viewed in the entirety of the deposition.

### Mitigating Factors

"The Respondent did not present any evidence in mitigation.

### Aggravating Factors

"The Court of Appeals has recognized the following aggravating factors:

20

'(1) Prior disciplinary offenses;
(2) A dishonest or selfish motive;
(3) A pattern of misconduct;
(4) Multiple offenses;
(5) Bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(6) Submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(7) Refusal to acknowledge the wrongful nature of conduct;
(8) Vulnerability of victim;
(9) Substantial experience in the practice of law; and
(10) Whether he or she displayed indifference to making restitution.'

"*See Att'y Griev. Comm'n v. Sperling*, 434 Md. 658, 676–77, 76 A.3d 1172, 1183 (2013) (citing Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions). The Petitioner has alleged the existence of the following aggravating factors: (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple offenses; (7) refusal to acknowledge the wrongful nature of conduct; (9) substantial experience in the practice of law; and (10) indifference to making restitution. This Court agrees.

\*\*\*

## CONCLUSIONS OF LAW AS TO EACH CHARGE

21

"For the reasons stated below, this Court finds, by clear and convincing evidence, that the Respondent violated the following Maryland Lawyers' Rules of Professional Conduct and the Maryland Attorney's Rules of Professional Conduct:[]

**MLRPC Rule 1.6 Confidentiality of Information**

"Rule 1.6 provides, in part,

'(a) a lawyer shall not reveal information related to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized to carry out the representation, or the disclosure is permitted by section (b) of this Rule.'

"The Court finds that the Respondent violated Rule 1.6 when he disclosed to Ms. Gaither, in his May 15, 2012 email, that Mr. Hedgepeth would not settle his case for less than one million dollars. Despite the Responden[t]'s insistence that he intended to express his own goals in his statements to Ms. Gaither regarding the *Hedgepeth* settlement, the Court cannot and will not ignore the plain and obvious meaning of '[Mr. Hedgepeth] will not accept a settlement less than $1 Million.' The Court similarly rejects Respondent's argument that disclosing a client's expectations for settlement does not constitute a violation of Rule 1.6 simply because lawyers do so regularly; the Court will not speculate on what attorneys do in

their day-to-day practice, but it will not accept the argument that regularity voids culpability. The Respondent failed to obtain Mr. Hedgepeth's informed consent before making the disclosure, despite his assurances to Ms. Gaither that he had done so. Therefore, the Court concludes that the Respondent has violated Rule 1.6.

## MLRPC 5.4 Professional Independence of a Lawyer

"Rule 5.4 provides, in part:

'(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) an agreement by a lawyer with the lawyer's firm, partner, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2) a lawyer who purchases the practice of a lawyer who is deceased or disabled or who has disappeared may, pursuant to the provisions of Rule 1.17, pay the purchase price to the estate or representative of the lawyer;

(3) a lawyer who undertakes to complete unfinished legal business of a deceased, retired, disabled, or suspended lawyer may pay to that lawyer or that lawyer's estate the portion of the total compensation which fairly represents the

23

services rendered by the former lawyer;

(4) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement; and

(5) a lawyer may share court-awarded legal fees with a nonprofit organization that employed, retained or recommended employment of the lawyer in the matter.'

"The Court does not find that the Respondent violated Rule 5.4(a) when he paid Ms. Gaither $5,000. The Court is not convinced that the monies were in fact, fees attributable to the *Dyer* case. The Court believes that the agreements and emails were constructed and sent to lure Ms. Gaither into entering into an agreement with the Respondent's firm and the Respondent never intended to abide by the time constraints or the guaranteed return on the investment. As such the Court cannot find that it was an agreement to share fees. Therefore, the Court does not find by clear and convincing evidence that the Respondent violated Rule 5.4(a).

## MARPC Rule 8.1 Bar Admission and Disciplinary Matters

"Rule 8.1 provides, in part:

24

'An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact.'

"The Court does not find that the Respondent violated Rule 8.1(a). On June 20, 2018, during his statement under oath to Bar Counsel, the Respondent made several statements regarding his agreement with Ms. Gaither. As previously discussed, the Court does not find the statement to be knowing and intentional misrepresentations made under oath. Rather, the Court finds that since there was never any intent of the Respondent to comply with the initial agreement, his statement to Bar Counsel that he never intended to share fees with Ms. Gaither is not a knowing and intentional misrepresentation. Despite the language in the agreement, Respondent never intended and did not act in compliance with the contract or even the spirit of the contract. The Court, therefore, finds that there was not an agreement to share fees in the *Hedgepeth* and *Dyer* cases and as a result his statements to Bar Counsel were not knowing and intentional misrepresentations.

25

"The Respondent further testified under oath that he used Ms. Gaither's funds for 'anything the firm needed to keep things moving forward.' Petitioner asserts that this directly contradicts the Respondent's testimony at the July 30, 2019 hearing, at which he readily confessed he spent most of the funds on personal expenses. A full reading of the transcript puts these statements in context and the Court is not convinced that the Respondent made false statements to Bar Counsel. The Respondent admitted that he used the funds for personal expenditures and the statements were an explanation for why he used the funds in the manner that he did. Therefore, the Court finds that this statement to Bar Counsel was [not] a knowing and intentional misrepresentation.

## MLRPC/MARPC Rule 8.4. Misconduct.

"Rule 8.4 provides, in part:

'It is professional misconduct for a lawyer/attorney to:

(a) violate or attempt to violate the Maryland Lawyers'/Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another[;]
(b) commit a criminal act that reflects adversely on the lawyer's/attorney's honesty, trustworthiness or fitness as an attorney in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

26

(d) engage in conduct that is prejudicial to the administration of justice[.]'

"The Court finds that the Respondent violated the sections of Rule 8.4 as charged. Having violated other Rules of Professional Conduct, the Respondent violated Rule 8.4(a). *See Att'y Griev. Comm'n v. Foltz*, 411 Md. 359 (2009) (finding that where any attorney violated several other Rules of Professional Conduct, he necessarily violated Rule 8.4(a)).

". . . Additionally, the Respondent's extensive use of deception and deceit in regard to his dealings with Ms. Gaither also constitutes a violation of Rule 8.4(c). In *Attorney Grievance Comm'n v. Coppock*, the Court of Appeals held that Rule 8.4(c) applies not only to the practice of law, 'but extends to actions by an attorney in business or personal affairs that reflect on the individual's character and fitness to practice law. . . . '" *Attorney Grievance Comm'n v. Coppock*, 432 Md. 629, 644 (2013). As the attorney who represented Ms. Gaither in her employment discrimination case, the Respondent knew that Ms. Gaither had received a considerable sum of money as a result of the settlement and, taking advantage of their disparate levels of legal sophistication, proceeded to design a scheme to take those funds from her. The Court is persuaded

27

by the ruling of the Supreme Court of Appeals of West Virginia, which held in *Lawyer Disciplinary Bd. v. Battistelli* that "[i]f a lawyer converts [others'] monies to his or her own use without authorization, the attorney is subject to a disciplinary charge. Such conduct obviously reflects a dishonest and deceitful nature which violates the general precept that an attorney should avoid dishonesty or deceitful conduct." *Lawyer Disciplinary Bd. v. Battistelli*, 206 W.Va. 197, 203 (1999) (quoting *Committee on Legal Ethics of West Virginia State Bar v. Hess*, 186 W.Va. 514, 517 (1991)).

"Here, the Respondent used Ms. Gaither's funds for personal use and then lied to her about it repeatedly, stating that he would be applying her already-spent funds to upcoming cases. The intentional and calculated dishonesty necessary to carry out the Respondent's scheme is precisely the violative conduct the West Virginia Supreme Court of Appeals addressed in *Hess*, and unmistakably exposes the Respondent to liability.

\*\*\*

"It should be noted that, although not argued by Petitioner, there is an open question of whether an attorney-

28

client [relationship] was still in existence at the time of the agreement between Ms. Gaither and the Respondent. Some courts have found when loans between attorneys and client[s] occur close in time to the legal services, especially when settlements are reached, that a continuation of the attorney-client [relationship] is found. (*Hunniecutt v. State Bar of California*, 44 Cal.3d 362, 748 P.2d 1161 (1988) (finding that it [is] reasonable to examine the relationship between the parties to determine whether the attorney-client relationship still existed); *Lawyer Disciplinary Bd. v. Battistelli*, 206 W.Va. 197, 205 (1999) (finding that elements of trust, rapport, and gratitude were present to compel the conclusions that the attorney-client relationship had not terminated when the loan was procured.). The Supreme Court of Minnesota has explained it as follows, '[s]ince the duty of fidelity and good faith arising out of the confidential relation of attorney and client is founded not on the professional relation per se, but on the influence which the relation creates, such duty does not always cease immediately upon the termination of the relationship but continues as long as the influence therefrom

exists.'  *Colstad v. Levine*, 243 Minn. 279, 67 N.W.2d 648, 654–55 (1954).

"Since testimony and argument did not address this issue sufficiently for the Court to consider, the Court will not make that finding.  However, the Court is not constrained in considering such a fact in rendering its decision involving an attorney, who had recently terminated an attorney-client relationship through the settlement of a case.  The Court concludes . . . as a matter of law that an attorney who uses information about a client's recent settlement for a considerable amount of money who then solicits that same client for a loan brings the legal profession into disrepute in violation of Rule 8.4(d).  This is especially true considering the following additional facts: that the client and the attorney had no previous relationship prior to their engagement; the client was not legally sophisticated in any respect; and the amount of time between the termination of the client-attorney relationship was short, days in this case.

"The Court further concludes that the Respondent's conduct, taken as a whole, most certainly brings the legal profession into disrepute in violation of Rule 8.4(d).  As stated

throughout this opinion thus far, the Respondent used his status as an attorney to persuade a former client to provide him with funds under false pretenses. After the May 5, 2012 settlement, the Respondent wasted no time in approaching Ms. Gaither, and had an investment agreement drafted and ready for Ms. Gaither's signature ten days later, on May 15, 2012. The Respondent took advantage of Ms. Gaither's trust in him which was gained while he acted in the capacity of her attorney to induce her to give him $27,000 under the guise of a legitimate financial investment. The Respondent then misappropriated Ms. Gaither's funds for his own personal use and made knowing and intentional misrepresentations to her regarding the use of her funds and the settlement of the *Hedgepeth* case."

(Footnotes in original).

## II.

Judge Schweitzer found that respondent violated MLRPC 1.6(a) and MLRPC 8.4/MARPC 19-308.4(a), (c), and (d). Respondent excepts to Judge Schweitzer's findings of fact and conclusions of law.[12] Respondent rejects Judge Schweitzer's findings of facts,

---

[12] Respondent notes that his "[e]xception is filed out of time with the consent of the Petitioner."

presents before this Court the same arguments that he presented before her, and seeks

essentially a *de novo* review of her findings. As to Judge Schweitzer's conclusions of law,

respondent excepts generally that the case at bar does not implicate MLRPC/MARPC and

falls outside the mandate of the Commission because he and Ms. Gaither engaged each

other as private citizens after their attorney-client relationship ended. Respondent argues

as follows:

> "The [Commission] has taken what amounts to a business
> transaction between two individuals and attempted to construe
> it as [a] violation of an attorney's fiduciary duties to a client.
> This is simply untrue.
>
> The Maryland Lawyers' Rules of Professional Conduct are
> rules that should be interpreted and applied to the purposes of
> legal representation and of the law itself."

In respondent's view, the matter between him and Ms. Gaither should be adjudicated

instead as a common law contract dispute before the District Court.

As to Judge Schweitzer's findings of fact related to MLRPC 1.6(a), respondent

argues that there is "*no proof* whatsoever" that he revealed confidential client information

about Mr. Hedgepeth to Ms. Gaither. Respondent points out that the Commission could

have but did not call Mr. Hedgepeth—"a critical witness in the Court's analysis," in

respondent's view—to testify. Respondent acknowledges that in his agreements with Ms.

Gaither, "pending cases in litigation were referred to [in order to] support the vitality of the

practice," but argues that his conduct did not violate MLRPC 1.6(a) because such conduct

"occurs every day by lawyers across the country with loan companies who provide a client loan or attorney loan."[13]

As to Judge Schweitzer's findings of fact related to MLRPC 8.4/MARPC 19-308.4(a), (c), and (d), respondent argues that there is "absolutely no evidence of deceit, dishonesty or fraud" on his part. As to her conclusion of law, respondent argues that "[t]his is a case of unfortunate results that caused financial hardship to two private citizens" and that "[b]ad luck and unfortunate case results do not equate to a violation of the rules of ethics."

## III.

This Court has "original and complete jurisdiction" in attorney grievance matters and "conducts an independent review of the record." *Att'y Grievance Comm'n v. Ambe*, 466 Md. 270, 286, 218 A.3d 757, 765–66 (2019). We accept the hearing judge's findings of fact unless we conclude that they are clearly erroneous. *Id.* at 286, 218 A.3d at 766. If the hearing judge's factual findings are based on "competent material evidence," they are not clearly erroneous, and we will not disturb them. *Id.* On the other hand, we review the hearing judge's conclusions of law *de novo*. *Id.*

---

[13] At oral argument before this Court, respondent stated repeatedly that it is a "common practice in personal injury law" for attorneys to "tell [loan companies] the facts of the case, *with the client's permission*." He stated, "I did it with many other clients as well, *with their permission*."

33

Although the Commission did not charge respondent with violating MLRPC 1.8/MARPC 19-301.8 (Conflict of Interest; Current Clients; Specific Rules), whether Ms. Gaither continued to be respondent's client at the time of their financial transactions, thereby triggering other applicable rules of professional conduct, is an important issue in this matter. This issue is central to respondent's defense of his conduct.

MARPC 19-301.8 governs business transactions between an attorney and a client and provides in pertinent part as follows:

> "(a) An attorney shall not enter into a business transaction with a client unless:
>
> > (1) the transaction and terms on which the attorney acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
> > (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek independent legal advice on the transaction; and
> > (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the attorney's role in the transaction, including whether the attorney is representing the client in the transaction."[14]

---

[14] "When necessary, the attorney should discuss both the material risks of the proposed transaction, including any risk presented by the attorney's involvement, and the existence of reasonably available alternatives and should explain why independent legal advice is desirable." Md. Rule 19-301.8, cmt. 2; *see also In re Gold*, 668 N.Y.S.2d 605 (N.Y. App. Div. 1998) (holding that the attorney violated the New York equivalent of MARPC 19-301.8 by borrowing $57,000 from a former client and representing both borrower and lender in the transaction).

These safeguards are "intended to prevent 'overreaching' when a lawyer engages in a financial transaction with a client, given a lawyer's skill and training and the relationship of trust with a client." *Att'y Grievance Comm'n v. Shapiro*, 441 Md. 367, 388, 108 A.3d 394, 406 (2015); *see* Md. Rule 19-301.8, cmt. 1; *see also People v. Culter*, 277 P.3d 954, 959 (Colo. O.P.D.J. 2011) (holding that "[b]y neglecting to provide the safeguards that would alert the [clients] to [attorney's] own self-interest, . . . Respondent acted without the vigilant dedication to his clients' interests to which they were entitled").

Judge Schweitzer discussed this issue in her conclusions of law, but because the Commission had not charged a violation of MLRPC 1.8/MARPC 19-301.8, she characterized respondent's relevant conduct as a violation of MLRPC 8.4(d) instead, explaining as follows:

> "*The Court concludes . . . as a matter of law that an attorney who uses information about a client's recent settlement for a considerable amount of money who then solicits that same client for a loan brings the legal profession into disrepute in violation of Rule 8.4(d).* This is especially true considering the following additional facts: that the client and the attorney had no previous relationship prior to their engagement; the client was not legally sophisticated in any respect; and the amount of time between the termination of the client-attorney relationship was short, days in this case.
>
> *The Court further concludes that the Respondent's conduct, taken as a whole, most certainly brings the legal profession into disrepute in violation of Rule 8.4(d).*"

(Emphasis added).

We reject respondent's argument that Ms. Gaither was no longer his client when he entered into financial transactions with her and that MLRPC/MARPC are not applicable to

the case at bar. Whether the transaction is classified as a "loan" or an "investment," Ms. Gaither continued to be a client of respondent. Our conclusion is informed by attorney discipline cases in our sister jurisdictions, where bar counsels have brought the charge of violating the equivalent of MLRPC 1.8/MARPC 19-301.8 against attorneys who solicited and received personal loans from "former" clients. In such cases, courts have held that attorney-client relationships persisted (1) if the transactions are "the result of overreaching or manipulation of the former relationship," *In re Ricco*, 426 N.Y.S.2d 887, 888 (N.Y. App. Div. 1980), or, stated differently, (2) "if the circumstances are such that the former client reasonably expects the lawyer to exercise professional judgment therein for the protection of the [former] client," *In re Ioannou*, 89 A.D.3d 245, 250 (N.Y. App. Div. 2011) (internal quotation omitted) (alteration in original); *see also In re Imming*, 545 N.E.2d 715, 721 (Ill. 1989) (regarding loans from "former" clients for an attorney's non-legal business, holding that they "occurred so close in time to the respondent's legal services to each client as to *cause the client to believe that the respondent's business relations were a continuation of the attorney-client relationship*") (emphasis added); *La. St. Bar Ass'n v. Williams*, 498 So.2d 727, 728 (La. 1986) ("A lawyer may not enter into a business transaction with a client if they have differing interests therein and *if the client expects the lawyer to exercise his professional judgment on that matter for the protection of the client*[.]") (emphasis added); *Law. Disciplinary Bd. v. Battistelli*, 523 S.E.2d 257, 263 (W. Va. 1999) (noting that the "former" client "still considered the Respondent his attorney and felt obligated to

36

give the Respondent the requested loan since the Respondent had assisted him in obtaining a favorable result" in his case).

To determine if a financial transaction resulted from an overreaching or manipulation of the attorney-client relationship, courts have considered factors such as (a) the proximity in time between the last attorney-client interaction and the first conversation about the financial transaction at issue, (b) the location of the conversation (*e.g.*, in the attorney's office, "amidst the trappings of their attorney-client relationship"), (c) the attorney's knowledge of the client's possession of lendable money (in particular, a settlement received from the attorney's representation), (d) the client's willingness to make the transaction largely because of the attorney-client relationship (*e.g.*, in the case of a former client "who said he had never before lent anyone more than $20"), (e) the client's desire to help the attorney out of gratitude for the attorney's representation, and (f) the client's trust in the attorney (*e.g.*, as demonstrated by the client's not seeking independent legal advice about the transaction). *In re Ioannou*, 89 A.D.3d at 249. This is a "highly fact-specific inquiry." *Id.* at 250.

In *Hunniecutt v. State Bar*, 748 P.2d 1161, 1167 (Cal. 1988), the Supreme Court of California held specifically that there is an attorney-client relationship as a matter of law where a client receives settlement proceeds and is then solicited by the attorney to invest "the fruits of the attorney's representation" in the attorney's (other, non-legal) business. The court explained as follows:

> "A client who receives the proceeds of a judgment or
> settlement will often place great trust in the investment advice

37

of the attorney who represented him in the matter. This is especially likely when the client is unsophisticated and a large amount of money is involved. This trust arises directly from the attorney-client relationship, and abuse of this trust is precisely the type of overreaching that rule 5–101[15] is designed to prevent. Accordingly, when an attorney enters into a transaction with a former client regarding a fund which resulted from the attorney's representation, it is reasonable to examine the relationship between the parties for indications of special trust resulting therefrom. We conclude that if there is evidence that the client placed his trust in the attorney because of the representation, an attorney-client relationship exists for the purposes of rule 5-101 even if the representation has otherwise ended."

*Id.* at 1166–67; *see also In re Imming*, 545 N.E.2d at 721 (regarding loans from "former" clients for an attorney's non-legal business, noting as significant that some of the clients had "directly invested the proceeds of the legal work respondent performed for them"); *Williams*, 498 So.2d at 728 (stating that "an unsophisticated client who is asked for a loan by her attorney out of her settlement proceeds is justified in believing the lawyer is acting as her attorney and guardian of her interests"). This construction does not "dramatically extend the definition of an 'attorney-client relationship' beyond its common understanding." *Hunniecutt*, 748 P.2d at 1167. The Supreme Court of Minnesota has explained as follows:

"Since the duty of fidelity and good faith arising out of the confidential relation of attorney and client is founded, not on the professional relation *per se*, but on the influence which the relation creates, such duty does not always cease immediately upon the termination of the relation but continues as long as the influence therefrom exists."

---

[15] The California equivalent of MLRPC 1.8/MARPC 19-301.8.

38

*Colstad v. Levine*, 67 N.W.2d 648, 654–55 (Minn. 1954).

In the case at bar, the attorney-client relationship between respondent and Ms. Gaither continued through their financial transactions. Relevant factors we consider include the fact that respondent broached the topic of an "investment" just days after Ms. Gaither received her portion of the settlement fund and Ms. Gaither's lack of legal sophistication. We overrule respondent's exception.

Regardless of whether Ms. Gaither is a current or former client of respondent, we hold that respondent violated MLRPC 1.6(a) and MLRPC 8.4/MARPC 19-308.4(a), (c), and (d). First, as to the charge of violating MLRPC 1.6(a), whether there was an attorney-client relationship between respondent and Ms. Gaither has no bearing on whether respondent violated his duty of confidentiality to his client Mr. Hedgepeth by disclosing Mr. Hedgepeth's settlement expectation to Ms. Gaither without his informed consent. Second, as to the charge of violating MLRPC 8.4/MARPC 19-308.4(a), (c), and (d), we have held that this rule applies broadly to attorneys' conduct inside and outside their practice of law. We have held specifically that MLRPC 8.4(c)/MARPC 19-308.4(c) "extends to actions by an attorney in business or *personal* affairs that reflect on the individual's character and fitness to practice law." *Att'y Grievance Comm'n v. Coppock*, 432 Md. 629, 644, 69 A.3d 1092, 1100 (2013) (emphasis added).

We hold that respondent violated MLRPC 1.6(a). Respondent, although denying that there is any proof of his violation, fails to address Judge Schweitzer's factual finding regarding respondent's May 15, 2012 email to Ms. Gaither, in which respondent wrote,

"[Mr. Hedgepeth] will not accept a settlement less than $1 Million[.]" Judge Schweitzer found, based on respondent's testimony during his statement under oath and at the hearing, that respondent failed to obtain Mr. Hedgepeth's informed consent before disclosing to Ms. Gaither the amount that Mr. Hedgepeth was willing to accept in settlement. This finding of fact is based on "competent material evidence" despite lack of testimony from Mr. Hedgepeth, and it is not clearly erroneous.

Respondent claims that sharing information about pending cases with third-party litigation funders for client or attorney loans is commonplace and argues that this negates any wrongdoing. We agree with Judge Schweitzer in rejecting, without "speculat[ing] on what attorneys do in their day-to-day practice," that "regularity voids culpability." Attorneys must uphold their duty of confidentiality to their clients and secure the client's informed consent before disclosing any confidential client information to third-party litigation funders. *See, e.g.*, *Phila. Bar Ass'n Prof'l Guidance Comm., Advisory Op.* 2003-15 (2003); *Md. St. Bar Ethics Comm., Advisory Op.* 2000-45 (2000) (in discussing ethical implications of loans by private entity to personal injury plaintiffs, stating that "[a]ll courses of action must have the client's consent"). Respondent's disclosure as to the amount Mr. Hedgepeth was willing to settle for was a confidential matter.

We hold that respondent violated MLRPC 8.4/MARPC 19-308.4(a), (c), and (d). Judge Schweitzer found extensive deception and deceit by respondent in his dealings with Ms. Gaither throughout their financial transactions. For example, Judge Schweitzer found that respondent used Ms. Gaither's funds for personal use and then lied repeatedly to Ms.

40

Gaither about it, stating that he would apply her previously spent funds to upcoming cases. We overrule respondent's exception of simply denying Judge Schweitzer's findings, as they are not clearly erroneous.

Respondent argues that his conduct was the result of "[b]ad luck and unfortunate case results . . . between two private citizens." We overrule this exception to Judge Schweitzer's conclusion of law. First, this is not a case of "two private citizens" because, as noted above, there was an ongoing attorney-client relationship between respondent and Ms. Gaither. Second, respondent violated MLRPC 8.4/MARPC 19-308.4 regardless of Ms. Gaither's status as a former or current client because the rule extends to an attorney's dishonest *personal* dealings outside his practice of law. *See Coppock*, 432 Md. at 644, 69 A.3d at 1100. Finally, respondent's characterization of the events and conduct in question as "[b]ad luck and unfortunate case events" goes directly against Judge Schweitzer's findings of fact, which respondent has not shown to be clearly erroneous. Judge Schweitzer found that respondent, from the beginning, before any alleged misfortune took place, "never had any intention of using Ms. Gaither's funds to pay for litigation costs." She found that respondent's "investment opportunity" was a deception created to obtain funds from Ms. Gaither under false pretenses and to use those funds as an interest-free personal loan. These findings are based upon the evidence before Judge Schweitzer and are not clearly erroneous. Based on these factual findings, respondent violated MLRPC 8.4/MARPC 19-308.4(a), (c), and (d).

41

## IV.

We now turn to the appropriate sanction to be imposed. Bar Counsel recommends disbarment for the "central issue in this case" of respondent's "use of deception and deceit to obtain funds from a former client," drawing similarities between the case at bar and *Att'y Grievance Comm'n v. Agbaje*, 438 Md. 695, 735–36, 93 A.3d 262, 285 (2014), in which we disbarred an attorney for providing false and misleading information to his *current* client with whom he entered into a (non-legal) business transaction. The Commission argues that "[l]ike the attorney in *Agbaje*, the Respondent took advantage of Ms. Gaither's lack of experience, and her trust in him as an attorney, to induce her to giving him $27,000 . . . and then provided Ms. Gaither with misleading and false information." On the other hand, respondent, in his filed exception, recommends a private reprimand for "poor judgement with a prior client" as the appropriate sanction.[16]

The purpose of sanctioning an attorney is to protect the public rather than to punish the errant attorney. *See Att'y Grievance Comm'n v. Phillips*, 451 Md. 653, 677, 155 A.3d 476, 490 (2017). Furthermore, it serves as deterrence against similar misconduct. *Id.* The severity of the sanction depends on the particular facts and circumstances of each case, including consideration of any mitigating or aggravating factors. *See Att'y Grievance Comm'n v. Angst*, 369 Md. 404, 416–18, 800 A.2d 747, 755 (2002).

---

[16] At oral argument before this Court, respondent did not recommend a particular sanction and deferred to the discretion of the Court. Respondent also stated that this was his first and only loan dealing with a former client.

Our cases make clear that "[d]isbarment ordinarily should be the sanction for intentional dishonest conduct." *Att'y Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 418, 773 A.2d 463, 488 (2001). In *Angst*, 369 Md. at 420, 800 A.2d at 757, we "iterated the unparalleled importance of honesty in the practice of law," explaining as follows:

> "Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character."

(Internal quotation and citations omitted).

Respondent presented no mitigating factors. Judge Schweitzer noted several aggravating factors: a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of conduct, substantial experience in the practice of law, and indifference to making restitution.[17] We conclude that disbarment is the appropriate sanction for respondent's misconduct.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS**

---

[17] At oral argument before this Court, respondent made repeated representations as to restitution. He stated, "I will make her whole at any given moment, pursuant to promises of the contract, if she sues me in general District Court of Maryland or gets a . . . confessed judgment . . . unless we can just reach a settlement." Respondent explained that he had not repaid Ms. Gaither in full as of now "only because [he] can't be in touch with her at all while this [proceeding] is pending."

**OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JONATHAN CHRISTIAN DAILEY.**